IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SANDRA OTMANI-HARBORA,

              Plaintiff,

     v.

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

              Defendant.

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 05-5165

**OPINION**

APPEARANCES:

Robert A. Petruzzelli, Esquire
Jacobs, Schwalbe & Petruzzelli, P.C.
Ten Melrose Avenue, Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Christopher J. Christie
United States Attorney
    By:  Arthur Swerdloff
        Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorneys for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2006), to review the final decision of the Commissioner of the Social Security Administration denying the application of Plaintiff, Sandra Otmani-Harbora, for Disability Insurance

Benefits under Title II of the Social Security Act.  See 42 U.S.C. §§ 401-34 (2006).

At issue in this case is whether the ALJ properly determined that Sandra Otmani-Harbora ("Plaintiff") had no disabling impairment or impairments prior to the expiration of her insurance benefits.  On December 1, 1993, Plaintiff stopped working due to an alleged disability.  Four months later, March 31, 1994, Plaintiff's disability insurance expired.  Based on the medical evidence available in the record, the ALJ determined Plaintiff's disability onset date was October 1995.

This Court must determine: (1) whether the Administrative Law Judge properly determined Plaintiff had no "severe" impairments, and therefore was not disabled, between December 1, 1993 and March 31, 1994, (2) whether the Administrative Law Judge was required to utilize a medical expert to determine the onset date of Plaintiff's disability, and (3) whether the ALJ failed to properly determine the plaintiff's residual functional capacity. For the reasons stated below, this Court will affirm the decision of the Commissioner denying Plaintiff's application for Disability Insurance Benefits.

Plaintiff filed several applications for Disability Insurance Benefits ("DIB"), all of which were denied.  For a claimant to receive DIB, a disabling condition must exist prior to the expiration of disability insurance.  20 C.F.R. §

2

404.320(b)(2) (2006); <u>Kane v. Heckler</u>, 776 F.2d 1130, 1131 n.1
(3d Cir. 1985).  Plaintiff's DIB applications have been denied by
the Social Security Administration because Plaintiff has not
demonstrated she was disabled prior to March 31, 1994, the
insurance expiration date.  (R. at 26, 146-49.)  Therefore,
Plaintiff appeals the ALJ's decision, asking this court to review
the ALJ's determination that she was not disabled prior to March
31, 1994.

**I. Standard of Review**

    A.   <u>Standard for Judicial Review</u>

    Under 42 U.S.C. § 405(g), Congress provided for judicial
review of the Commissioner's decision to deny a claimant's
application for Disability Insurance Benefits.  <u>See</u> <u>Ventura v.
Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must
uphold the Commissioner's factual decisions where they are
supported by "substantial evidence."  42 U.S.C. §§ 405(g),
1383(c)(3); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir.
2001).  Substantial evidence means more than "a mere scintilla."
<u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting
<u>Consolidated Edison Co. V. NLRB</u>, 305 U.S. 197, 229 (1938)).  It
means "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."  <u>Id.</u>  The inquiry is not
whether the reviewing court would have made the same
determination, but whether the Commissioner's conclusion was

3

reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988).  Indeed, the "substantial evidence standard is deferential
and includes deference to inferences drawn from the facts if
they, in turn, are supported by substantial evidence." Shaudeck
v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).

A reviewing court has a duty to review the evidence in its
totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).
"[A] court must 'take into account whatever in the record fairly
detracts from [a particular piece of evidence's] weight.'"
Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997)
(quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d
301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB,
340 U.S. 474, 488 (1951))).

The Commissioner "must adequately explain in the record
[the] reasons for rejecting or discrediting competent evidence."
Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing
Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third
Circuit has held an Administrative Law Judge "must review all
pertinent medical evidence and explain [any] conciliations and
rejections."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122
(3d Cir. 2000).  Similarly, an ALJ must also consider and weigh
all of the non-medical evidence presented.  See id. (citing Van
Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)).

The Third Circuit has held access to the Commissioner's

reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (citing

Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259

(4th Cir. 1977)).  A district court is not "empowered to weigh

the evidence or substitute its conclusions for those of the fact-

finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir.

1992).  However, an ALJ need not explicitly discuss every piece

of relevant evidence in his or her decision.  See Fargnoli, 247

F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a

reviewing court is required to satisfy itself that the

Commissioner arrived at a decision by application of the proper

legal standards.  Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir.

2000); Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983)

(stating that courts should examine the legal standard applied by

the agency because "the judiciary is the final interpreter of the

Social Security Act").

B.    Standard for Disability Insurance Benefits

The Social Security Act defines "disability" for purposes of

an entitlement to Disability Insurance Benefits ("DIB") as the

inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A) (2006). Under this definition, "a claimant qualifies as disabled only if [that claimant's] physical or mental impairments are of such severity that [the claimant] is not only unable to do his [or her] previous work, but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B) (2006).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 404.1520 (2006).  This five-step process is summarized as follows:

1. If currently is engaged in substantial gainful employment, the claimant will be found "not disabled."

2. If not suffering from a "severe impairment," the claimant will be found "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4. If able to still perform work done in the past despite the severe impairment, the claimant will be found "not disabled."

6

     5.    Finally, the Commissioner will consider the claimant's ability to perform work, age, education, and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If incapable, the claimant will be found "disabled."  If capable, the claimant will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is therefore dependent upon finding the claimant is incapable of performing work in the national economy.

This five-step process involves a shifting burden of proof. Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of his claim by a preponderance of the evidence.  Id.  In the final step, the Commissioner bears the burden of proving that work is available for the claimant: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987) (citing Chicager v. Califano, 574 F.2d 161 (3d Cir. 1978)).

## II. Background

    A.   Procedural History

In 1998, Plaintiff filed an application for DIB under Title II of the Social Security Act, alleging disability commencing on December 1, 1993 due to a brain cyst, sleep disorder, side

effects from pain medication, stress, left eye and ear pain, back

pain, neck pain, arm and leg pain and frequent migraine

headaches.  (R. at 283-91.)[1]  The SSA denied the application on

initial consideration (R. at 155-59) and on reconsideration (R.

at 163-65) and Plaintiff requested a hearing (R. at 166-67),

---

[1] Plaintiff filed three disability applications for DIB between 1993 and 1998.  The first two applications, filed in 1993 and 1996, were denied by the Social Security Administration (R. at 41-46, 215-19) and the plaintiff did not appeal either denial. (R. at 145.)  Plaintiff's third application for DIB, filed in October 1998, is the subject of this appeal.  (R. at 200-02.)

Although not raised by the Commissioner, Plaintiff's failure to appeal the denial of her first DIB application in 1993 could bar consideration of the third DIB application in 1998.  A denial of a claimant's application for DIB is binding unless that claimant requests reconsideration within 60 days of the initial determination.  20 C.F.R. §§ 404.905; 404.909 (2006).

However, by considering Plaintiff's third DIB application (1998) on its merits, the ALJ reopened Plaintiff's initial DIB application (1993).  An application may be reopened for "good cause" within four years from the date of the initial denial.  20 C.F.R. § 404.988 (2006).  Additionally, the Third Circuit has held that an ALJ de facto reopens an initial application when the ALJ considers the plaintiff's subsequent application on the merits.  Purter v. Heckler, 771 F.2d 682, 693 (3d Cir. 1985). See also Kaszer v. Massanari, 40 F. App'x 686 (3d Cir. 2002) (holding a de facto reopening is not contingent on finding "good cause," but instead by consideration on the merits).  Here, the ALJ considered Plaintiff's 1998 application for DIB on the merits and in doing so, de facto reopened Plaintiff's initial 1993 application.

Such a reopening is not barred by the four year regulatory limitation contained within 20 C.F.R. § 404.988(b) because the record does not contain the date the 1993 application was denied. As a result, the record offers no way to determine when the four year clock started running or when it stopped.  Therefore, this Court finds the ALJ reopened the plaintiff's initial application by considering the subsequent application on the merits and will decide this appeal.  See Purter, 771 F.2d at 693 ("more significance should be placed on fairness in the administrative process than on the finality of administrative judgments").

which was held before an Administrative Law Judge ("ALJ") on December 7, 2000.  (R. 29-89.)

ALJ Daniel W. Shoemaker, Jr. issued a partially-favorable decision on May 23, 2001, finding that Plaintiff was disabled, but not entitled to DIB because she was not disabled before her insurance period expired.  (R. at 138-50.)  The ALJ found the plaintiff disabled as of October 1995 because from that time the severity of her fibromyalgia, cervical spinal disorder and lumbar spinal disorders prevented her from engaging in "substantial gainful activity on a regular sustained basis."  (R. at 149.) However, the ALJ also found Plaintiff's disability insurance expired on March 31, 1994.  (R. at 149.)  As a result, ALJ Shoemaker denied Plaintiff's DIB claim, explaining that Plaintiff's impairments did not rise to the level of severity required for a finding of disability until October 1995, after the expiration of Plaintiff's disability insurance on March 31, 1994.  (R. at 146-49.)

Plaintiff requested review by the Appeals Council (R. at 183), which partially reversed the decision, finding the ALJ did not provide sufficient reasoning for determining that Plaintiff was not disabled between December 1, 1993 (the disability onset date claimed by Plaintiff) and October 1995 (the ALJ's determined onset date).  (R. at 151-54.)  The Appeals Council remanded the case to the ALJ to provide further discussion of Plaintiff's

condition between December 1, 1993 and October 1995.  (R. at 151-54.)

On remand, ALJ Shoemaker heard Plaintiff's case again on May 22, 2003 (R. at 90-135), and on January 29, 2004 he issued a decision finding Plaintiff was not disabled prior to October 1995 because she had not met the step two burden by sufficiently demonstrating the "severity" of her impairments during the period at issue.  (R. at 17-27.)  As a result, the ALJ again denied the Plaintiff's claim for DIB, finding no disability between the date Plaintiff alleges disability onset (December 1, 1993) and the date Plaintiff's insurance expired (March 31, 1994).  (R. at 26.) As a result of finding at the step two inquiry that Plaintiff was not disabled, the ALJ did not continue with the sequential disability analysis.  (R. at 25-26.)

Plaintiff filed for review of the ALJ's second decision (R. at 15-16), but the Appeals Council denied the request for further review.  (R. at 9-11.)  Plaintiff then filed the present action with this Court on October 28, 2005 [Docket Item 1].

B. Evidence in the Record

1. Plaintiff's Testimony

Plaintiff is a resident of Voorhees, New Jersey who was fifty-four years old at the time of the administrative hearing in 2000.  (R. at 36.)  She drives short distances several times a week, usually to go to a store, but generally refrains from

10

driving long distances.  (R. at 39, 40.)  Her physical condition
and pain medication allegedly make it difficult to engage in most
activities (R. at 79-81), so she rarely grocery shops for herself
(R. at 79), can only perform short household chores and does not
go out socially.  (R. at 80-81.)  Additionally, arthritis caused
her to abandon her hobbies of sewing and embroidering (R. at 79),
so she spends much of her time watching television.  (R. at 80.)

Plaintiff last worked in 1993 for Underwriters Marketing
Service, performing secretarial and data entry work.  (R. at 51.)
The position was primarily a sedentary job where she did not
carry more than ten pounds regularly or stand or walk for more
than two hours in an average day.  (R. at 52.)  However, that job
often required her to bend, stoop, kneel and reach, because of
the varying height of the filing cabinets.  (R. at 52-53.)  In
December 1993, Plaintiff quit her job due to alleged back and
neck pain, trouble concentrating and stress.  (R. at 46-47, 54.)
By the time she stopped working, Plaintiff claims she suffered
from neck pain when staring at the computer, migraines, stress
and lower back pain reaching down into her legs, all of which
made it "harder and harder to work."  (R. at 41, 46-47.)  At the
time, Plaintiff was consuming up to 800mg of ibuprofen every 3
hours and alleges that "her stomach was bleeding from taking so
much Advil."  (R. at 46-47.)

At the hearing, Plaintiff testified that the allegedly

11

disabling physical and psychological conditions existed prior to December 1, 1993.  (R. at 57-86.)  Plaintiff claimed that a car accident in 1980 initially caused her spinal problems and that her treating physician at the time, Dr. Cheerno, allegedly diagnosed her with whiplash and disc herniations.  (R. at 57-58.)  Additionally, Plaintiff testified that she has suffered from fibromyalgia since 1981, but that it was not diagnosed until 1996.  (R. at 75.)  By 1988, she experienced back pain that would radiate down her legs and arms, and her chiropractor, Dr. Gerald Renato, diagnosed her with spinal stenosis and herniations.  (R. at 59, 62-63.)  Plaintiff testified she sought chiropractic treatment between 1987 and 1995 from Dr. Renato and Dr. Christopher Lyden, (R. at 60) and stopped because she felt the treatment was not alleviating her pain.  (R. at 61.)

By 1995, Plaintiff claimed, her lower back worsened to the point that she had problems sitting for more than an hour and standing for prolonged periods.  (R. at 64-65.)  In October 1995, doctors diagnosed severe spinal stenosis in her lumbar region and recommended surgery.  (R. at 58.)  Plaintiff waited until March 1996 to have surgery, delaying due to childcare issues and her mother's illness.  (R. at 117.)  Between the time she left work in 1993 due to spinal pain, migraines and stress, and the time she had surgery in 1996, Plaintiff testified that her lower back pain continually increased in frequency and intensity.  (R. at

12

65.)

Additionally, Plaintiff claimed she suffers from irritable
bowel syndrome (R. at 63), a sleep disorder (R. at 47, 81),
depression (R. at 69-70), and prolonged migraine headaches three
to five times per week.  (R. at 60, 62.)  After she complained of
vision trouble in 1996, doctors diagnosed a brain cyst that was
putting pressure on her eye.  (R. at 71.)  Plaintiff described
how the stress and depression made it difficult for her to
function and how she sought counseling by speaking occasionally
with her Department of Veterans Affairs vocational psychologist.
(R. at 83-85.)  Finally, she explained how the pain medication
prescribed for her back, Furocot and Codeine, impaired her
concentration.  (R. at 73, 77.)

> 2. <u>Medical Reports</u>

Plaintiff submitted medical evidence for the years between
1982 and 2003.  However, there is a paucity of objective medical
evidence in the record for the specific time period at issue,
December 1993 to October 1995.  In determining Plaintiff's
disability onset date was October 1995, the ALJ considered and
evaluated all the medical evidence submitted.  Similarly, this
Court will consider all relevant medical evidence in the
administrative record in evaluating Plaintiff's appeal.

> a. <u>Medical Records Prior to March 31, 1994</u>

Plaintiff presented various medical reports recorded prior

to her insurance expiration date, March 31, 1994, including
physician records, CT scans and x-rays.  Additionally, Plaintiff
submitted the impressions of a non-treating vocational
psychologist who interacted with Plaintiff during that time.  At
the administrative hearing, Plaintiff testified that in 1980 her
primary physician at the time, Dr. Cheerno, diagnosed her with
whiplash, arthritis changes, spinal herniation and disc
herniations resulting from a car crash.  (R. at 57-58.)  However,
Plaintiff submitted no medical evidence of such a diagnosis or
notes from Dr. Cheerno.  Notes from Plaintiff's primary physician
of 25 years, Dr. Michael L. Marone, (R. at 469-96) indicate
Plaintiff suffered from migraines in 1983 (R. at 477) and
occasionally complained of varied pains and limitations (R. at
470-77).

In 1982, Plaintiff began speaking with a Department of
Veterans Affairs counseling psychologist, Louis N. Namm, about
her veterans benefits.  (R. at 468, 602-03, 617-621.)  While they
did not enter into a treating relationship and Mr. Namm is not a
clinical psychologist,[2] Mr. Namm observed Plaintiff's physical
and emotional state during this time.  (R. at 468, 618.)
Plaintiff submitted letters written by Mr. Namm in 1999, 2000 and

_____

[2] Louis N. Namm holds a Masters degree in Vocational
Educational Counseling and specializes in vocational
rehabilitation at the Department of Veterans Affairs.  (R. at
468, 618.)

14

2003, which contain his recollections of Plaintiff's condition between 1982 and 2001.  (R. at 468, 602-03, 617-621.)  Mr. Namm recalled that between 1982 and 1984, Plaintiff expressed concern about back pain interfering with her daily living.  (R. at 617-18.)

Dr. Marone's notes from 1985 and 1986 indicate that Plaintiff complained of lower back pain.  (R. at 476.)  In February 1986, x-rays revealed mild degenerative changes in Plaintiff's lower lumbar segments and the asophyseal joints of her spine.  (R. at 476, 495.)  In May 1986, Plaintiff complained to Dr. Marone of recurrent sciatic pain (R. at 476) and he referred her to an orthopedist, Dr. Harold S. Friedman (R. at 359-64).  Dr. Friedman's report from December 4, 1986 indicates that his physical examination revealed "very little in the way of solid findings."  (R. at 360.)  It states that Plaintiff had a symmetric, but slightly limited cervical range of motion, no point tenderness, no step-off along the cervical spinal processes and no paraspinal spasms.  (Id.)  Examining the lumbar region, Dr. Friedman found very little paraspinal tenderness and a symmetric, but a slightly limited range of motion in all directions.  (Id.)  The x-rays of the lumbar spine were "within normal limits" and Dr. Friedman did not "see any major Orthopedic Etiology for her problems."  (R. at 361.)____

While Plaintiff received chiropractic care from Drs. Renato

and Lyden from 1987 to 1990, the record contains only brief notes and no medical findings for the relevant time period.  Plaintiff initially received chiropractic treatment from Dr. Renato who, around 1990, sold his practice to Dr. Lyden and relocated.  (R. at 108-10.)  Unable to obtain Dr. Renato's medical opinion for her condition during that period, Plaintiff submitted the medical notes of Dr. Renato's and Dr. Lyden's chiropractic treatment from 1987 to 1991.  (R. at 369-89.)  The record also contains a medical report from a May 1988 CT scan requested by Dr. Renato, which shows no fracture or dislocation in the spine but reveals mild degenerative changes in the asophyseal joints, a potential partial defect at L5, S1, mild lateral recess stenosis at L3-4 and a pronounced stenosis at L4-5 due to a disc herniation.  (R. at 366.)

_____Between 1990 and 1991, Plaintiff complained of back pain to Dr. Marone (R. at 474) and continued chiropractic care without any significant change (R. at 369-89).  Dr. Marone's notes from May 1990 show Plaintiff had a back spasm, but the examination revealed no costovertebral angle tenderness and normal reflexes. (R. at 474.)  Plaintiff continued chiropractic treatment (R. at 373-74, 75-76), but Dr. Lyden's notes and findings provide no orthopedic or neurological findings and indicate that Plaintiff was seen during the time period with varying frequency and treated for various complaints, including muscle spasms and

16

thoracic pain.  (R. at 369-72.)

In February 1991, Plaintiff visited Mr. Namm who noted that she displayed signs of depression and poor self-esteem.  (R. at 602, 619.)  At that time, Mr. Namm recommended that Plaintiff seek professional counseling, but her insurance would not cover the cost of treatment.  (Id.)  As a result, Mr. Namm offered to stay in touch over the phone if Plaintiff wanted to talk, but he did not initiate a treating relationship.  (Id.)

On July 25, 1992, Plaintiff fell in her home, injuring her neck, right hand and right ankle.  (R. at 367, 464.)  On Dr. Marone's referral, Dr. Henry Edward David, a doctor with the New Jersey Department of Labor, examined Plaintiff's injuries on August 4, 1992.  (R. at 367-68, 464-66.)  Dr. David found cervical and dorsal muscle tenderness, mild discomfort and some limited motion, but no spasms.  (R. at 367, 465.)  Plaintiff showed tenderness in her right wrist, but Dr. David noted that she was intact neurologically and examination of the extremities was unremarkable.  (Id.)  X-rays of the spine and wrist revealed moderately advanced discogenic disease at C5-6 and scattered areas of degenerative changes in the dorsal spine.  (R. at 367, 465.)  Dr. David's report indicated recent and chronic cervical and dorsal strain and sprain.  (R. at 368, 465.)  Dr. David recommended continuing chiropractic care (R. at 368, 466), but indicated that at the time of the evaluation "there was no

17

evidence that she was disabled" and Plaintiff was capable of working with some limitation due to the sprain of her right wrist.  (R. at 466.)

During 1993, Plaintiff continued to see her primary physician, Dr. Marone, and complained of sinus headaches and a sore throat, but did not otherwise seek treatment for her back and neck problems.  (R. at 473.)  In his 2003 letter, Mr. Namm recollects a visit by Plaintiff in November 1993, where she complained of her various physical conditions and "serious periods of depression."  (R. at 602, 619.)  Mr. Namm remembers that by November 1993 his opinion was that Plaintiff could not obtain or hold employment.  (R. at 468, 602.)

The record contains no significant medical reports for the time period between December 1, 1993 (the onset date claimed by Plaintiff) and March 31, 1994 (the date Plaintiff's insurance benefits expired).  While Plaintiff stopped working in December 1993, she did not seek treatment for any change to her spinal problems, other than sporadic chiropractic appointments, until October 1995, which the ALJ found to be her disability onset date.  (R. at 369-72.)

                         b. Post-Coverage Medical Evidence (After Mar 31, 1994)

Plaintiff visited Dr. Marone complaining of a sinus infection and had an MRI performed in October 1994, which showed no evidence of inflammatory or malignant involvement.  (R. at

473, 486.)  Additionally, Dr. Marone's 1994 notes show no specific complaints of neck or back pain.  (R. at 473-74.)

However, records from 1995 reveal that Plaintiff's spinal problems had worsened by that time.  In October 1995, a CT scan revealed severe canal stenosis at L3-4 and L4-5, degenerative changes, disc changes, ligamentum flavum infolding, central disc herniation at L3-4 and a central disc bulge at L4-5.  (R. at 431.)  The CT scan findings showed Plaintiff in a worse condition than she had been in 1988.  (Id.)  A November 1995 neurosurgical consultation suggested the presence of a disc herniation and recommended spinal surgery at the L3-4 and L4-5 levels.  (R. at 440-41.)  An MRI from January 1996 diagnosed bony degenerative changes, a moderately bulging disc at C5-6, bilateral lateral recess and foraminal stenosis, but did not identify any clear cut root entrapment.  (R. at 430, 580.)  Dr. Frederick A. Simeone operated on Plaintiff in March 1996 to attempt to alleviate her spinal pain, performing a bilateral L3-L4 laminectomy and excision of a cyst.  (R. at 390-93.)  Additionally, Dr. Simeone dissected around the L5 nerve root to move the herniated disc, which was compressing the dura.  (Id.)

After the surgery, medical records indicate Plaintiff was diagnosed with several additional impairments, including

19

fibromyalgia[3] in October 1996 and Raynauds syndrome[4] in March
1996.  (R. at 399-402.)  During the same period, an MRI of the
plaintiff's brain revealed a cyst affecting her left eye's optic
tract, but showed Plaintiff otherwise had normal orbits, optic
nerves and chiasm.  (R. at 397.)  In December 1999, Dr. Lewis S.
Alban, a psychologist with the New Jersey Department of Labor's
Division of Disability Determination Services conducted a mental
status evaluation, determined that Plaintiff had some
psychological disorders and issued a Global Assessment of
Functioning score of 50[5].  (R. at 497-501)

---

[3] Fibroymalgia is "one of a group of nonarticular (not
affecting joints) rheumatic diseases [] characterized by dull and
persistent pain, tenderness, and stiffness of (1) muscles, (2)
regions where tendons are inserted into bones, and (3) nearby
soft tissues.  These symptoms can be due to overuse of muscles or
be secondary to another, underlying disorder."  2 J.E. Schmidt,
M.D., Attorney's Dictionary of Medicine and Word Finder F-81
(2005).  Fibromyalgia is the subject of some controversy in the
medical field and may not be immediately diagnosed by physicians.
See Marie McCullough, Fibromyalgia Diagnosis Confusing,
Controversial, Philadelphia Inquirer, November 11, 2000 (stating
many doctors "'question the very existence of fibromyalgia'");
Jerome Goodman, Hurting All Over: With So Many People in So Much
Pain, How Could Fibromyalgia Not be a Disease, New Yorker,
November 13, 2000, at 78.

[4] Raynaud's syndrome is "[a] disease marked by spasms of the
blood vessels in the limbs, especially in the legs, and more
often in the toes.  During an attack, the affected part aches and
feels cold.  The spasms are usually initiated by exposure to cold
and by emotional strain."  5 J.E. Schmidt, M.D., Attorney's
Dictionary of Medicine and Word Finder R-34 (2005) (defining
Raynaud's syndrome as synonymous with Raynaud's disease).

[5] A Global Assessment of Functioning score of 50 corresponds
to "serious symptoms (e.g., suicidal ideation, severe obsessional
rituals, frequent shoplifting) OR serious impairment in social,

### 3. ALJ Findings

ALJ Shoemaker found Plaintiff was not disabled between December 1, 1993 and October 1995 because he found the medical evidence indicated that Plaintiff's impairments, individually and in combination, were not severe at that time.  (R. at 26.)   The ALJ found Plaintiff's medical records indicated a long list of medically determinable impairments, but also showed the impairments did not significantly limit Plaintiff's ability to perform basic work-related activities prior to October 1995.  (R. at 26.)  Additionally, the ALJ found that Plaintiff's subjective complaints of pain and stated limitations during the period at issue were not credible based on the lack of medical evidence indicating an impairment that would reasonably cause such levels of pain or limitation.  (R. at 25-26.)  Therefore, ALJ Shoemaker's step two inquiry concluded that Plaintiff was not disabled during before October 1995 because the medical evidence indicated that Plaintiff suffered only from various non-severe impairments between December 1, 1993 and October 1995.

## III. Discussion

In finding Plaintiff's impairments to be non-severe prior to October 1995, the ALJ considered medical evidence from 1982 to 2003.  Through testimony and medical records, Plaintiff is

---

occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 2000).

21

attempting to demonstrate she suffered from various severe impairments that reached the level of disability prior to the expiration of her disability insurance on March 31, 1994. Plaintiff asks this court to reverse the ALJ's finding of no disability during the period at issue based on three arguments: 1) the ALJ "failed to properly determine whether the plaintiff suffers a 'severe' impairment" (Pl.'s  Br. at 5-9), 2) the ALJ erred by failing to request a medical expert to determine the onset date of her disability (Pl.'s Br. at 13-15), and 3) the ALJ failed to properly determine the plaintiff's "residual functional capacity."  (Pl.'s Br. at 10-13.)   All three arguments are considered below.

A.   Whether the ALJ Properly Determined that Plaintiff Suffers from no "Severe" Impairment.

Plaintiff argues the ALJ erred in dismissing this case at step two of the sequential disability analysis because the ALJ's decision 1) was not supported by substantial evidence (Pl.'s Br. at 5-9), 2) failed to consider Plaintiff's subjective complaints of pain (Pl.'s Br. at 7-8), and 3) failed to consider the limitations on basic work-activities caused by Plaintiff's impairments.  (Pl.'s Br. at 7-9.)  Defendant argues the ALJ properly determined no "severe" impairments existed based on substantial evidence that showed Plaintiff's subjective complaints of pain were not credible and Plaintiff's had no limitations on her ability to perform basic work activities.

(Def.'s Br. at 6-11.)   In reviewing the administrative record, this Court declines to reverse the ALJ's step two determination of no "severe" impairments because the findings were based on substantial evidence, considering both Plaintiff's subjective complaints of pain and whether Plaintiff had any limitations on her ability to perform basic work activities.  (R. at 23-25.)

To establish that a "severe" impairment exists, a plaintiff must show her impairment is more than a slight abnormality and significantly limits her ability to work.  SSA regulations describe the step two inquiry in terms of what is not a "severe" impairment, explaining an impairment that does not "significantly limit[] [the plaintiff's] physical or mental ability to do basic work activities" does not constitute a severe impairment.  20 C.F.R. §§ 404.1520(c); 404.1521(a)(2006).  Basic work activities are defined as "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (quoting 20 C.F.R. § 140.1521(b) (2006)).  However, the plaintiff's impairment should be considered "severe" if the plaintiff proves it is something beyond a "slight abnormality or combination of slight abnormalities."  Bowen v. Yuckert, 482 U.S. 137, 158 (1987) (O'Connor, J., concurring).  As the Third Circuit stated in Newell, "[o]nly those claimants with slight

abnormalities that do not significantly limit any 'basic work activity' can be denied benefits at step two."  347 F.3d at 546 (citing Justice O'Connor's concurrence in <u>Yuckert</u>, 482 U.S. at 158).  The Third Circuit has instructed that "if the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met, and the sequential evaluation process should continue."  <u>Id.</u>; <u>see also</u> <u>Newell</u>, 347 F.3d at 546 (step two inquiry "is a <u>de</u> <u>minimis</u> screening device to dispose of groundless claims").

In determining whether an impairment is severe, the ALJ, as the ultimate finder of fact, must consider all the evidence in the record and may weigh the credibility of the evidence. <u>Burnett</u>, 220 F.3d at 122.  However, if choosing to disregard evidence, the ALJ must provide an adequate explanation as to why it should be disregarded.  <u>See</u> <u>Adorno v. Shalala</u>, 40 F.3d 43 (3d Cir. 1994) (vacating and remanding where ALJ failed to explain how plaintiff with asthma could return to job which included exposure to dust and fumes).  In reviewing the ALJ's findings, this court has a duty to review the evidence in its totality. <u>Daring</u>, 727 F.2d at 70.

Plaintiff's substantial evidence argument fails in light of the ALJ's reasonable conclusion, based on substantive discussion and evaluation of all the medical evidence, that Plaintiff's impairments were not severe during the period at issue.  (R. at

24

22-26.)  In determining Plaintiff had no severe impairments prior
to October 1995, the ALJ discussed each medical record from that
period separately, finding no evidence indicating Plaintiff had
functional limitations or significant impairments that could
impact Plaintiff's ability to perform basic work activities.
(Id.)  Specifically, the ALJ noted Plaintiff only complained of
sinus pain and a sore throat to her primary physician during the
two years at issue.  (R. at 23.)  Additionally, the ALJ gave
substantial weight to Dr. David's findings in 1992 (which was the
physical examination closest in time to the period at issue) that
Plaintiff had no limitations that would prevent her from working.
(R. at 23.)  Finally, the ALJ discussed the rest of Plaintiff's
medically determinable impairments, finding most were diagnosed
in 1996 or later and that the medical evidence showed no
indication of limitation prior to October 1995.  (R. at 22-26.)
Considering all the evidence before him, the ALJ found the
doctors' notes and opinions indicated Plaintiff was not suffering
from a severe impairment between December 1, 1993 and March 31,
1994.  Reviewing the ALJ's opinion and the medical evidence in
the record, this Court finds the ALJ's decision was reasonable
and was based on substantial evidence.

      Secondly, Plaintiff argues the ALJ failed to properly
consider Plaintiff's subjective complaints of pain in determining
whether her impairments were severe, as 20 C.F.R. § 404.1529

25

(2006) and SSR 96-7p, 1996 WL 374186 (2006) require.  However,
subjective complaints of pain "do not in themselves constitute
disability." Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir.
1984); 20 C.F.R. § 404.1529(a).  Complaints of pain must be
accompanied by medical signs that show the plaintiff has a
medical impairment that could reasonably be expected to produce
the pain or other symptoms alleged.  20 C.F.R. § 404.1529(a)
(explaining "statements about your pain or other symptoms will
not alone establish that you are disabled").  See Bittel v.
Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) (requiring
plaintiff to meet burden of showing medical impairment to support
subjective complaints of pain).  The ALJ is required to give
serious consideration to Plaintiff's subjective complaints of
pain.  Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).
However, "it is well established that the ALJ has discretion to
evaluate the credibility of a claimant and to arrive at an
independent judgment, in light of medical and other evidence,
regarding the true extent of the pain alleged by the claimant."
Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983)
(quoting Bolton v. Sec'y of HHS, 504 F.Supp. 288, 291 (E.D.N.Y.
1980)).

     When a plaintiff's subjective complaints of pain indicate a
greater severity of impairment than the objective medical
evidence supports, the ALJ can give weight to factors such as

26

physician's reports, lay opinions and the plaintiff's daily
activities.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL
374186, *4 (requiring the ALJ to "consider the entire case record
and give specific reasons for the weight given to the
individual's statements").  However, where an ALJ properly
determines the credibility of Plaintiff's subjective complaints
of pain, the reviewing court should not substitute its own
determination of credibility for that of the ALJ, given that the
ALJ had the opportunity to observe the plaintiff first-hand.  See
Weir v. Heckler, 734 F.2d 955, 962 (3rd Cir. 1984) (recognizing
that great deference is given to an ALJ's determination of
credibility).

     In this case, ALJ Shoemaker considered Plaintiff's
subjective complaints of pain by examining her testimony about
pain alongside all of the 1982 to 2003 medical evidence.  (R. at
22-26.)  In doing so, the ALJ found that prior to October 1995,
the physical examinations, x-rays, CT scans and doctors' opinions
did not indicate any impairment to support the intensity and
frequency of Plaintiff's subjective complaints of pain.  (Id.)
Thus, the ALJ found these complaints to be not credible based on
the medical evidence in the record.  After determining the
medical evidence indicated no impairments that could reasonably
cause the level of pain alleged, the ALJ found Plaintiff's
subjective complaints of pain to be exaggerated.  (R. at 25.)

Therefore, because the credibility determination was based on the medical evidence in the record, the ALJ properly considered the subjective complaints of pain and his findings are entitled to deference by this Court.

Finally, Plaintiff claims the ALJ's step two inquiry should be vacated because the ALJ failed to consider the vocational implications of Plaintiff's impairments.  In defining "severe" for step two inquiry, 20 C.F.R. § 404.1521 (2006) requires the ALJ to consider the impact of Plaintiff's impairments on the ability to perform "basic work activities," including the plaintiff's physical functions, sensory capacities, ability to understand and carry out simple instructions, use of judgment, ability to respond appropriately to supervision and ability to deal with changes in a work setting.  At the same time, 20 C.F.R. § 404.1521 does not mandate specific language for the ALJ's evaluation of the vocational implications of an impairment and an ALJ's rationale does not require particular language; nor must the ALJ adhere to a particular format as long as the opinion provides "sufficient development of the record and explanation of findings to permit meaningful review."  Jones v. Comm'r of Soc. Sec. Admin., 364 F.3d 501, 505 (3d Cir. 2004) (finding sufficient explanation where ALJ evaluated medical evidence in record and set forth that evaluation in opinion).

Here, the ALJ considered the vocational implications of

28

Plaintiff's impairments.  (R. at 26.)  Throughout his opinion,
ALJ Shoemaker discussed whether the medical evidence indicates
that Plaintiff is suffering from any functional limitations.  (R.
at 22-26.)  At the start of the opinion, ALJ Shoemaker indicated
that the inquiry into functional limitations includes whether
there are limitations to basic work activities.  (R. at 22.)  In
discussing Plaintiff's impairments, the ALJ found the medical
records did not indicate she had functional limitations that
would have prevented her from performing basic work activities
prior to October 1995.  (R. at 22-26.)  Instead, the medical
records showed any functional limitations were mild or non-
existent before 1995.  (Id.)

     While the ALJ did not specifically state that there were no
"limitations to basic work activities," the ALJ analyzed
functional limitations with basic work activities in mind, as
indicated by the ALJ's statement of the relevant rule that, "a
medically determinable impairment or combination of impairments
is severe if it significantly limits an individual's physical or
mental ability to do basic work activities."  (R. at 22.)  By
introducing the step two inquiry with language regarding
limitations to basic work abilities, the ALJ indicated that the
discussion of Plaintiff's functional limitations during the time
period at issue included his assessment of her basic work
abilities.

      B.    <u>Whether the ALJ was Required to Consult a Medical</u>
            <u>Expert Testimony to Determine the Onset of Plaintiff's</u>
            <u>Disability.</u>

In addition to demonstrating disability, in order to be entitled to DIB under Title II of the Social Security Act, plaintiffs must demonstrate the onset date of disability occurred prior to the expiration of their disability insurance.  20 C.F.R. § 404.320(b)(2) (2006); <u>Kane</u>, 776 F.2d at 1131 n.1.  Where a plaintiff cannot show that the date of disability onset precedes the date the plaintiff's disability insurance expires, the plaintiff is not entitled to DIB.  <u>De Nafo v. Finch</u>, 436 F.2d 737, 739 (3d Cir. 1971) (finding Plaintiff was not entitled to DIB when heart problem became disabling after insurance expiration date, but was non-severe while Plaintiff was insured).

Plaintiff argues the ALJ erred in determining the disability onset date as October 1995 without consulting a medical expert. (Pl.'s Br. at 13-15.)  According to Plaintiff, medical expert testimony is required here to infer the date of disability onset because inadequate medical records exist between December 1, 1993 and March 31, 1994.  (Pl.'s Br. at 14-15.)  Plaintiff argues that SSR 83-20, 1983 WL 31249 (2006) and the Third Circuit's holdings in <u>Newell</u>, 347 F.3d 541 and <u>Walton v. Halter</u>, 243 F.3d 703 (3d Cir. 2001) impose this requirement.  (<u>Id.</u>)  In response, Defendant argues SSR 83-20 only mandates a medical expert when inadequate medical records exist, and that in this case, the

30

medical records are sufficient for the ALJ to properly determine the onset date of Plaintiff's disability.  (Def.'s Br. at 11-12.)

The Court agrees with Defendant's interpretation of SSR 83-20.  The introduction to this ruling provides, in relevant part: "In many claims, the onset date is critical; it may . . . even be determinative of whether the individual is entitled to or eligible for any benefits. . . . Consequently, it is essential that the onset date be correctly established and supported by the evidence, as explained in the policy statement."  SSR 83-20, 1983 WL 31249, at *1.  This is especially true for disabilities of "nontraumatic origin," where onset involves consideration of the plaintiff's allegations, work history,  medical and other evidence concerning the severity of the plaintiff's impairment. Id. at *2.  The ALJ should consider medical evidence "as the primary element in the onset determination."  Id.  Where adequate medical records are not available to determine an onset date, it may be possible to reasonably infer the onset date occurred "some time prior to the date of the first recorded medical examination."  Id. at *3.  Thus, SSR 83-20 advises that the ALJ "should call on the services of a medical advisor when onset must be inferred."  Id.

When determining a disability onset date, the ALJ must rely on a "legitimate medical basis."  Walton, 243 F.3d at 708 (quoting SSR 83-20).  Based on the medical evidence, it may be

possible in some cases "to reasonably infer that the onset of a
disabling impairment(s) occurred some time prior to the date of
the first recorded medical examination."  Id.  Where it is
necessary to infer an onset date from the medical records, the
ALJ should request that a medical advisor infer the onset date to
ensure the onset date is determined on a legitimate medical
basis.  Newell, 347 F.3d at 548-49 (remanding where ALJ did not
use medical expert to infer onset date when plaintiff's liver
disease, diabetes and neuropathy reasonably could have become
disabling prior to first medical exam).  In Walton, the plaintiff
alleged disability on the basis of slowly progressing bi-polar
manic depression commencing twenty-eight years before the
administrative hearing.  243 F.3d at 705-06.  The ALJ set an
onset date based on the recollections of the plaintiff's
psychiatrists, who did not retain their medical records from the
relevant period.  Id. at 707-08.  The Third Circuit held the
ALJ's findings were unsupported by adequate medical records and
they remanded the case for the ALJ to appoint a medical expert to
infer the onset date as required by SSR 83-20.  Id. at 709-10.
But see Kelley v. Barnhart, 138 F. App'x 505, 509 (3d Cir. 2005)
(finding medical expert was not required when medical and lay
evidence tended to disprove Plaintiff's psychological disability
claim from sixteen years earlier); Ballardo v. Barnhart, 68 F.
App'x 337, 339 (3d Cir. 2003) (distinguishing Walton when

32

available "[medical] reports provided a legitimate medical basis for the ALJ to make an informed judgment as to the onset date").

In contrast to <u>Walton</u> and <u>Newell</u>, the ALJ in the present case had substantial medical evidence in the record to determine an onset date on a legitimate medical basis without needing to infer an onset date.  Plaintiff's October 1995 examination providing medical evidence of a disability was not her first medical examination, as were the examinations showing disability in <u>Walton</u> and <u>Newell</u>.  Here, Plaintiff had seen doctors for her various impairments and complaints throughout the relevant period and none of the medical reports, including the examination by Dr. David in 1992, indicated that she had any impairments that would limit her ability to perform basic work activities.  The ALJ determined that October 1995 was the disability onset date based on all of the medical evidence in the record covering the period between 1982 and 2003, specifically the diagnosis of fibromyalgia and Reynaud's syndrome in 1996 (R. at 399-402), medical evidence from CT scans and MRIs in 1995 (R. at 23, 430-31, 440-41, 580), Dr. David's examination in 1992 (R. at 23, 367-68, 464-66), Dr. Lyden's notes from 1990 to 1991 (R. at 22, 369-89), and a CT scan from Dr. Renato in 1987 (R. at 22, 366).  Additionally, the ALJ considered that Plaintiff continued to see her primary physician, Dr. Marone, between December 1, 1993 and October 1995 and that Dr. Marone's notes do not indicate any impairments during the

period at issue (R. at 469-96); those notes provide no evidence of any complaint of back or neck pain, trouble seeing, psychiatric concerns or any other medically determinable impairments during that time.

The ALJ relied on Plaintiff's vast medical history in determining an onset date.  In doing so, the ALJ did not infer an onset date.  Instead, he determined the onset date based on medical evidence showing that Plaintiff's impairments became disabling in October 1995.  SSR 83-20 requires an ALJ to utilize a medical expert only when the onset date cannot be determined on a "legitimate medical basis."  Kelley, 138 F. App'x at 509; Ballardo, 68 F. App'x at 339.  Here, the ALJ used the medical records not just from the time period at issue, but also from 1982 to 2003 as the legitimate medical basis for finding October 1995 was the disability onset date.  Therefore, because the ALJ determined the onset date based on substantial medical evidence in the record, the ALJ was not required to use a medical expert to determine an onset date in this case.

> C.   Whether the ALJ was Required to Consider Plaintiff's
>      Residual Functional Capacity

Finally, Plaintiff argues the ALJ failed to properly determine Plaintiff's "residual functional capacity" under step four and five of the sequential analysis.  (Pl.'s Br. at 10-12.)  However, for the ALJ to be required to determine "residual

functional capacity" at step four and five,  Plaintiff must first meet the threshold requirement of step two by demonstrating she suffered from a "severe" impairment or combination of impairments.  20 C.F.R. § 404.1520 (stating "[i]f you do not have a severe medically determinable physical or mental impairment . . . we will find that you are not disabled.").  As discussed above, the ALJ properly determined Plaintiff did not suffer from a "severe" impairment during the period at issue and stopped the sequential disability analysis at step two's threshold inquiry. Therefore, it is not necessary to determine whether the ALJ's findings address Plaintiff's "residual functional capacity" as required by step four and five when, as here, Plaintiff failed to demonstrate any "severe" impairments and had her claim dismissed at step two.


III.   **CONCLUSION**

     For the reasons stated above, the Commissioner's finding that Plaintiff was not disabled between December 1, 1993 and October 1995 will be affirmed.  The accompanying order will be entered.


**December 5, 2006**   _                    **s/ Jerome B. Simandle**
DATE                                         JEROME B. SIMANDLE
                                             United States District Judge